Dunlavey vs. Racine Malleable & Wrought Iron Co.

---

DUNLAVEY, by guardian *ad litem*, Appellant, vs. RACINE
MALLEABLE & WROUGHT IRON COMPANY, Respondent.

*April 13 — April 30, 1901.*

*Master and servant: Negligence: Evidence: Statutes: Fire escapes.*

1. A factory caught fire, and a servant sustained injuries by jumping
   from a third-story window. In an action for such injuries it ap-
   peared, among other things, that the master maintained a vat con-
   taining inflammable material at a point from thirty to thirty-five
   feet from a trip hammer operated in connection with the factory;
   that sparks from the trip hammer would not retain sufficient heat
   to cause any substance to ignite for a greater distance than twenty
   feet; that the fire was first discovered on a rack beside the vat,
   the rack being used to drain articles that had been dipped into the
   vat; that the rack was covered at the time, but in endeavoring to
   put out the fire the cover was knocked off, and soon thereafter fire
   appeared in the vat; and that the same conditions had existed for
   several years without developing danger from sparks. *Held*, in-

sufficient to support a verdict that the master was negligent in locating the vat and rack the distance they were from the trip hammer.

2. Ch. 355, Laws of 1895, provides that every factory building three stories or more in height, in which more than twenty-five people are employed, shall be provided with iron fire escapes on the outside of the building, but that its provision shall not apply to any buildings "now erected" which are supplied with a "reasonable fire escape or fire escapes." Defendant's factory, containing more than twenty-five employees, was erected prior to the passage of said act, and was in part three stories in height. There were five windows on the side of the three-story part, which looked out on the flat roof of the two-story part, the middle window extending to the floor of the third story, and to within one foot of the flat roof, the other windows being about three feet above such roof. Along one side of the two-story part there was a lean-to, the roof of which was six or seven feet below the roof of the two-story part, and about seven feet from the ground, with a firm ladder connecting the two roofs. There were inside stairways, three or four feet wide, at each end of the three-story part, leading from floor to floor to the ground floor below. In an action for personal injuries to an employee sustained by jumping from the third-story window, the factory having caught fire, it was *held* that the factory in question was, at the time of the passage of that act, supplied with a reasonable fire escape, within the meaning of that statute.

APPEAL from a judgment and order of the circuit court for Racine county: FRANK M. FISH, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Ingalls & Ingalls*, attorneys, and *William Smieding, Jr.*, of counsel, and oral argument by *Mr. Wallace Ingalls* and *Mr. Smieding.*

For the respondent there was a brief by *Kearney & Thompson*, and oral argument by *T. M. Kearney* and *J. V. Quarles.*

CASSODAY, C. J.    This is an action for personal injuries sustained by the plaintiff July 13, 1898, when he lacked two days of being fourteen years of age, while in the employ of the defendant in its factory in Racine, and in the act of es-

caping from the building, which was at the time being destroyed by fire alleged in the complaint to have been caused by the negligence of the defendant in permitting to be operated on the ground floor of such factory certain trip hammers, anvils, and forges in close proximity to a large, open, unprotected, and exposed vat or tank negligently situated on said ground floor, containing at all of the times herein mentioned a quantity of highly volatile and inflammable material, and by reason of such close proximity, and on said date, while said trip hammers, forges, and anvils were in operation by defendant, burning bits of heated iron, sparks of fire, and redhot scales of iron escaped, flew, and were driven from said trip hammers, anvils, and forges into, on, and about said tank so containing such inflammable substances, and thereby caused the same to ignite, and said entire factory building immediately took fire therefrom, and quickly filled with thick, black smoke and poisonous gases, which resulted in the entire destruction of said building. The complaint alleges that at the time of the fire plaintiff was engaged on the third floor, and by reason of the fact that the building was suddenly filled with fire, smoke, and gases, he was deprived of all means of escape from the burning building, except through a window in the third story, situated near the place of his employment; that, as the only means of escape from the building, he leaped or dropped from the window to the sidewalk or ground, a distance of nearly forty feet, and struck with great force thereon, and, as a result from the fall, fractured both lower limbs near the ankles, and sustained an impacted fracture of both ankle joints, and also sustained serious permanent injuries to the back and spine. The complaint further alleges, in effect, that the factory building was three stories in height, and for at least four years prior to its destruction was occupied in practically the same manner, defendant employing therein during all of that time more than twenty-five per-

sons; that at no time during such occupancy was the factory building provided with any fire escapes, as prescribed in ch. 355, Laws of 1895. Issue being joined and trial had, the court at the close thereof directed a verdict in favor of the defendant; and from the judgment entered thereon accordingly, and also from the order denying a new trial, the plaintiff appeals.

As stated, in substance, in the brief of attorneys for the plaintiff, this large manufacturing plant of the defendant had stood as then constructed about five years. It fronted on West street on the south, and extended to Milwaukee avenue on the west, and Geneva street on the east. It was three stories high for the whole distance on Geneva street, being sixty feet, with windows for each story. The front on West street was three stories high from Geneva street west for a distance of ninety-six feet, with an entrance near the middle, and then it was two stories high for a distance of forty-four feet to Milwaukee avenue, with windows for each story. There were five windows on the west side of the three-story part, looking out onto the flat roof of the two-story part; the middle one extending to the floor of the third story. Along on the north side of the two-story part was a one-story wooden lean-to, which extended east about seventy-five feet from the west line of the building. It was over fourteen feet from the ground floor in the three-story part to the floor of the second story, and twelve feet from the floor of the second story to the floor of the third story. The one and two story parts, together, were larger in area than the three-story part. The roof of the two-story part was flat, and descended towards the north. The distance from the roof of the second story to the roof of the one-story part was six or seven feet, and the distance from the roof of the one-story part to the ground was about seven feet. Between the roof of the one-story part and the roof of the two-story part there was a wooden ladder

reaching from one to the other, spiked to the cornice. The roof of the one-story part along a portion of the distance was just below the window sills of the second story. There were windows in all the several stories. There were large doors on each floor in the east end of the three-story part, opening on Geneva street. There were large doors, used for a driveway, on the ground floor of the three-story part, about the center, leading in from West street, on the south, and which was a main entrance. At the north side of the three-story part, and about the middle, there was an elevator shaft. There was an inside wooden stairway, from three to four feet wide, at each end of the three-story part, leading from floor to floor, and thence to the ground floor of the blacksmith shop below. The top floor of the three-story part was partitioned off into several compartments on either side of a passageway through the middle leading to the stairways and openings at each end. The third floor was the finishing department, where the polishing, buffing, and japanning were done. The second floor of the three-story part contained machinery, and the ground floor was the blacksmith shop, in which were operated several trip hammers, drop hammers, anvils, forges, and a large machine called a bulldozer. The blacksmith shop had a ground floor, excepting towards the westerly end, where there was a wooden floor or a platform made of boards laid on the ground, for the men to work on in ironing off whiffletrees and neck yokes. Such board floor was about sixteen feet wide and about twenty-five feet long. Along a portion of the south side of this platform a couple of planks were fastened, and on these planks were set some anvils for use by employees working on the platform. A vat, with draining rack attached, used for dipping and draining neck yokes and whiffletrees, and containing a quantity of benzine and gloss oil, was situated close to the north side of the platform in the blacksmith shop. The tank was about five feet long and two feet wide,

and made of iron, and was buried halfway underground, and the vat proper was covered with a board cover, which had been in use for several years. The draining rack connected with the vat was inclined so the drip would run back into the tank, instead of on the ground, on which neck yokes and whiffletrees were laid to drain after dipping. The vat was five or six feet further north from the trip hammer than the old one formerly was, in order to be safer from fire. The fire was first discovered on the draining rack, and almost at the same time, through cracks or openings in the cover, fire was discovered in the vat. The long way of the platform in the blacksmith shop was east and west, wholly situated west of the main driveway going into the blacksmith shop from the south; and the bulldozer was east of the west end of the platform, and east of the main driveway in from the south. Propelka's trip hammer was situated about due south from the vat, and was the nearest trip hammer to the vat, and was situated on the south side of the platform, and about five feet from the south side thereof. This hammer had been operated by Propelka at the same place and on the same kind of work for several years, and was near the south wall of the blacksmith shop, and west of the south entrance. In operating this machine Propelka stood between the south wall of the blacksmith shop and the hammer, facing the vat to the north, with his forge to the right. Carlson operated a trip hammer in the blacksmith shop about twenty-five feet distant from the Propelka hammer, on the east side of the driveway. At the time of the fire there were at least twenty-five men and boys employed on each of the three floors. Gus Bartz had charge of the boys on the third floor when the foreman was out. At the time of the fire the plaintiff was employed, with others, including Gus Bartz, in the southwest corner room on the third floor, and there were windows from that room west looking out onto the two-story roof, which room was within three feet of the fire.

The two-story part was occupied as the woodworking department, and the one-story part contained the annealing ovens. This manufacturing plant in no way joined or was connected with any other building or buildings.

The accident happened just after the noon hour. According to the record, the origin of the fire was and is unknown. It was first discovered on the rack mentioned, and was then about as large as a lamplight. How it originated is left by the evidence to mere conjecture. The rack was just on the west side of the vat, and inclined therefrom towards the west, as stated. The vat was covered on that day, but in trying to put out the fire the cover was knocked from the top by some one, and soon thereafter fire appeared in the vat. Whether the flame from the rack ran down into the vat or not, the witnesses were unable to say. The theory of the plaintiff, as indicated from the statement of his counsel, seems to be that the fire was started by sparks flying from Propelka's trip hammer, and setting fire to the vat or rack, or both. As indicated, that trip hammer was situated south of the platform described, and the vat and rack were both north of that platform, and directly or nearly directly north from that trip hammer. It is also undisputed that the vat and rack were from thirty to thirty-five feet north of that trip hammer. There is no evidence tending to prove that such sparks from that trip hammer would retain sufficient heat to cause any substance to ignite for a greater distance than twenty feet, but it appears to be affirmatively established to the contrary. Certainly, there is no evidence tending to prove that they would retain such heat for a distance of twenty-five feet,— much less, thirty feet. The same condition of things had existed for many years without developing any danger from such sparks. No verdict for damages could be sustained without being supported by evidence. Such a verdict could not rest upon mere conjecture,— obviously not, when contrary to all reasonable prob-

Dunlavey vs. Racine Malleable & Wrought Iron Co.

abilities. We must hold that the evidence is insufficient to support a verdict that the defendant was negligent in locating the vat and rack the distance they were from the trip hammer.

Counsel for the plaintiff further contend that the plaintiff is entitled to recover by reason of the absence of any fire escape, as prescribed by ch. 355, Laws of 1895 (sec. 4575*a*, S. & B. Ann. Stats.; sec. 4390, Stats. 1898). The seventh section of that act, then and now in force, provides that "none of the provisions of this act shall apply to any buildings *now erected* and which are supplied with a reasonable fire-escape, or fire-escapes." Sec. 1636*e*, Stats. 1898, p. 1187; sec. 25, ch. 351, Laws of 1899. The several parts of the building in question, as described by the plaintiff's counsel, are given above. It was constructed in 1894, and hence the provisions of ch. 355, Laws of 1895, quoted, were applicable to this building. The plaintiff testified to the effect that when the whistle sounded he started out from his room, in the southwest corner of the building, on the third floor, to see what was the matter,— what was going on in the shop; that he went east to where some workmen were at the fire hose, and heard some one shout, "Fire! Get out;" that he then turned back to his room to get his coat; that there was neither smoke nor fire on the third floor at that time; that he tried to go down the west stairway, and was driven back by the smoke; that he then went to the stairway at the east end of the building, and reached the second floor, and started down the stairway to the first floor; that the door at the foot of that stairway was opened by some one, and the smoke drove him back to the second floor; that he stood for a time at the east doorway of the second floor, which was cut down to the level of the second floor, and was open at the time; that he then went to the third floor, and into a small room in the southeast corner, from the window of which he dropped to the ground. Thus it appears from

the plaintiff's testimony, and the statement made as to the condition and shape of the different parts of the building, that when the fire started he was in his room on the west side of the third floor of the building; that, after going to the east part of the building to learn the cause of the alarm, he returned to his own room for his coat; that five windows opened from that third floor out onto the flat roof of the two-story part, descending towards the north; that four of such windows came down to within three feet of the third floor; that the middle window of the five was at the westerly end of a hallway extending east and west, and was cut down to the level of the third floor, so that it was only about one foot from that door down to the flat roof of the second story; that it was so cut down in order to furnish easy means of egress from the third story to the flat roof of the second story; that such flat roof of the second story was only a few feet below any of the five windows on that west side; that such flat roof of the second story had been much used as a lounging place during the noon hour by the employees on the third floor, including the plaintiff; that the distance from the flat roof of the two-story part to the flat roof of the one-story part was not more than six or seven feet, with a firm ladder upon which to descend; that the distance from the flat roof of the one-story part to the ground did not exceed seven feet. The statute relied upon only required " one or more " fire escapes in buildings " three or more stories high." After careful consideration, we have reached the conclusion that the building in question was at the time of the passage of the act relied upon, " supplied with a reasonable fire escape," within the meaning of that statute.

*By the Court.*—The judgment and order of the circuit court are both affirmed.

Dodge, J., took no part.